**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TIG INSURANCE COMPANY,
<u>Plaintiff-Appellant,</u>

v.

No. 97-2637

DEATON, INC.; TRAVELERS INSURANCE
COMPANY,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-96-92-3-P)

Argued: June 3, 1998

Decided: December 18, 1998

Before NIEMEYER and HAMILTON, Circuit Judges, and
FABER, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished opinion. Judge Faber wrote the opinion, in
which Judge Niemeyer and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Randel Eugene Phillips, MOORE & VAN ALLEN,
P.L.L.C., Charlotte, North Carolina, for Appellant. F. Fincher Jarrell,
KENNEDY, COVINGTON, LOBDELL & HICKMAN, L.L.P.,
Charlotte, North Carolina; James Orr Cobb, Jr., RUFF, BOND,

COBB, WADE & BETHUNE, L.L.P., Charlotte, North Carolina, for Appellees. **ON BRIEF:** M. James Grode, MOORE & VAN ALLEN, P.L.L.C., Charlotte, North Carolina, for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

FABER, District Judge:

TIG Insurance Company ("TIG") filed this action seeking a declaratory judgment that a policy of insurance issued by it to Deaton, Inc. ("Deaton") does not provide indemnity coverage to Deaton for workers compensation benefits paid to Daniel Lee Coffman ("Coffman"), a Deaton employee. TIG maintained that Coffman's claim was covered by a rival policy of insurance issued to Deaton by The Travelers Insurance Company ("Travelers"). The United States District Court for the Western District of North Carolina denied the relief requested by TIG and granted summary judgment in favor of Deaton and Travelers, after which TIG took this appeal. Finding no error in the decision of the district court, we affirm.

I.

The relevant facts are not in dispute. Deaton is an interstate trucking company which operates throughout the United States. Its principal place of business and home office are in Birmingham, Alabama. Deaton has no fixed system of routes; it hauls full trailer loads directly from shippers to ultimate destinations. Deaton's interstate drivers tend to reside near the company's local terminals, making it easier for them to get home after completing their runs.

Coffman had lived in North Carolina for over three years before going to work for Deaton. He applied for a job at Deaton's Wilson,

2

North Carolina terminal, signing an application which contained the following language:

> All questions of law and fact which may arise regarding this application, or regarding any aspect of any employment relationship between me and the Company, will be interpreted, determined, and resolved in accordance with the laws of the State of Alabama, regardless of where I or my residence may be located at the time of hire or at any time during the course of my employment. For purposes of the application of Worker's Compensation Laws and the payment of Benefits thereunder, all driver employees of Deaton, Inc., regardless of their place of residence at the time of hire, enter into their employment relationship in the State of Alabama, and are domiciled, supervised, based, and have as their principal location of employment, the State of Alabama.

Marion Poole, Deaton's manager at the Wilson terminal, discussed this provision with Coffman. When Coffman signed the application, he agreed to the provision and understood that it became one of the terms of his employment contract with Deaton. The final approval for Coffman to drive for Deaton took place in Birmingham, Alabama. Deaton required Coffman, as a condition of his employment, to travel in Alabama and other states.

Coffman made his first trip as an interstate truck driver for Deaton on March 3, 1992; he drove for approximately two weeks before his injury. During those two weeks, he made seven trips, which included pickups and deliveries in six different states, including a pickup in Alabama. He was on the road continuously from March 3, 1992, until the time of his accident, and never returned to the Wilson terminal. Coffman parked his tractor in North Carolina only once -- when he stopped at his home overnight while traveling from Maryland to Georgia. The load Coffman was carrying at the time of his injury was picked up by him at Deaton's terminal in Birmingham, Alabama, and delivered to Charlotte, North Carolina.

On the other hand, Coffman has been a North Carolina resident at all relevant times; he was recruited, tested, and informed that he had

3

been hired through the Wilson, North Carolina terminal; he completed his training with a North Carolina driver, beginning or ending all training trips in North Carolina; he was supervised and received dispatching instruction from the Wilson terminal; he began or ended all of his solo trips for Deaton except one in North Carolina and on that one, he spent the night in North Carolina; and, he paid state income taxes only to North Carolina.

Coffman's injury occurred on March 17, 1992, while delivering a load of steel pipe to a destination in Charlotte, North Carolina. A pipe fell on his head, paralyzing him from the neck down and leading to amputation of his left foot. Coffman personally decided to file a workers compensation claim in North Carolina, believing himself to be employed there.

At the time of Coffman's accident, Deaton's policies with both TIG and Travelers were in effect. Deaton's plan for insuring workers compensation claims was to have all of its interstate drivers treated as Alabama employees and covered by the TIG policy. To this end, Deaton included in its employment application the provision quoted above to which Coffman acceded. Deaton paid premiums to TIG for all of its interstate drivers, including Coffman.

The TIG policy was supplemented by state specific policies covering Deaton's workers compensation exposure for intrastate workers not included in the TIG policy. The Travelers policy provided primary workers compensation coverage in several states in which Deaton maintained terminals, including North Carolina. Consistent with Deaton's general plan, the Travelers policy was designed to cover only local drivers and employees who worked at terminals. Deaton submitted to the North Carolina Rate Bureau a request for assigned risk compensation insurance representing that such insurance would cover only clerical employees, sales employees, terminal workers and city or local drivers. Travelers issued its policy based upon the submission to, and direction from, the North Carolina Rate Bureau. The required premium was based upon Deaton's payroll for its shop facility, its city or local drivers, and its clerical employees. As an interstate driver, Coffman was not included in this calculation. Travelers received no premium for Coffman or any other Deaton interstate drivers.

4

On March 23, 1992, Deaton reported Coffman's injury to the Workers Compensation Division of the Alabama Department of Industrial Relations. By December 30, 1992, Deaton had exceeded its $250,000 self-insured retention ("SIR") with respect to Coffman's claim, and requested reimbursement from TIG under the TIG policy. TIG initially accepted coverage, since the claim was being processed under Alabama's workers compensation law. TIG began reimbursing Deaton for payments Deaton had made in excess of the $250,000 SIR.

On January 3, 1995, more than two years after beginning to reimburse Deaton for Coffman's claims, TIG informed Deaton that it had come to TIG's attention the proper jurisdiction may be North Carolina, not Alabama, and that TIG reserved its right to seek reimbursement of all payments made to, or on behalf of, Deaton for Coffman's injuries.

On March 12, 1996, TIG filed this declaratory judgment action in the Western District of North Carolina. Federal jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. TIG sought: (1) a declaration that Travelers, and not TIG, is liable for the benefits paid to Coffman because Coffman's workers compensation claims arise under the North Carolina Workers' Compensation Act; and (2) reimbursement from Deaton of all benefits paid by TIG to Deaton regarding Coffman's claims. By Order entered October 6, 1997, the district court, applying Alabama law, granted summary judgment for Deaton, holding that the TIG policy, not the Travelers policy, covered the Coffman claims as a matter of law. Relying on the court's decision, Travelers then filed its own motion for summary judgment. By Order entered on October 15, 1997, the court likewise granted Travelers' motion for summary judgment. This appeal by TIG ensued.

II.

The standard for appellate review involving the grant or denial of a summary judgment motion is de novo. Thus, the Court of Appeals uses the same standard as the district court. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

5

is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must view the facts in the light most favorable to the non-moving party with all reasonable inferences drawn in favor of such party. Id. at 255. The non-moving party is entitled to the presumption that all his evidence is credible. Miller v. Leathers, 913 F.2d 1085, 1987 (4th Cir. 1990). The party seeking summary judgment has the initial burden to show the absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett , 477 U.S. 317 (1986). The opposing party must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248. A scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. Id.

III.

A.

Deaton's intent in acquiring these two policies of insurance is clear. Deaton's purpose was to insure its interstate drivers under the law of the company's home state, Alabama, for job-related injuries wherever occurring. The TIG policy was designed to do this. Deaton then supplemented this coverage with state specific policies covering its various intrastate risks. The Travelers policy was one such policy; it was designed to cover claims of Deaton employees who worked solely within North Carolina.

Premiums paid by Deaton to TIG were based on the risk to Deaton's interstate drivers, specifically including Coffman. Premiums paid to Travelers were based on Deaton's payroll for sales, clerical and terminal workers, and local drivers, all of whom worked exclusively in North Carolina. There were seven such employees specifically covered by Travelers -- Coffman was not one of them. The express terms of the two policies, and the way premiums were calculated under them, shows that Deaton, TIG and Travelers all under-

6

stood that Coffman would be covered by TIG and not Travelers. Under the terms of his employment application and contract, Coffman accepted this arrangement and agreed to be treated as an Alabama employee covered by the TIG policy. Accordingly, everyone -- Deaton, TIG, Travelers and Coffman -- intended for Coffman to be covered by TIG and not Travelers.

A policy of insurance is a contract.[1] There are few principles more fundamental to the law than the proposition that a contract must be construed to give effect to the intentions of the parties. Accordingly, the parties' intent should be implemented here unless the laws of Alabama or of North Carolina compel a different result.

Alabama law specifically provides for the type of arrangement Deaton made to cover its workers compensation risk across the several states in which it operates. Alabama Code § 25-5-35(c) provides: "An employee whose duties require him to travel regularly in the service of his employer in this and one or more other states may, by written agreement with his employer, provide that his employment is principally localized in this or another such state.. . ."

Coffman agreed in his application with Deaton that the principal location of his employment for the purpose of workers compensation benefits was Alabama. Thus, if Coffman's employment meets the requirements of § 25-5-35(c), his employment is "principally localized" in Alabama, and he would then be entitled to workers compensation benefits under Alabama law for injuries sustained outside Alabama. The district court's analysis, in terms of Coffman's eligibility for benefits under Alabama law, is sound. As that court noted, the issue is whether "travel regularly . . . in this and one or more other states" means the employee must simply travel regularly in more than one state so long as one of those states is Alabama, or whether it requires that the employee travel regularly in Alabama and regularly in one or more other states. Relying on Heater v. Tri-State Motor Transit Co., 644 So.2d 25 (Ala. Civ. App. 1994), the district court fol-

---

[1] **Black's Law Dictionary** p. 802 (6th ed. 1990), defines insurance as "[a] contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils."

7

lowed the plain meaning of the statute in adopting the first of these competing constructions. This reasoning is sound, and there is no question that, in his brief employment with Deaton, Coffman traveled in Alabama and in other states. Coffman's employment is therefore "principally localized" in Alabama under the Alabama statute, and he is eligible for benefits under Alabama law for job-related injuries wherever they occur. This is precisely the risk Deaton sought to insure against with TIG and which TIG agreed to cover.

Early cases considered workers compensation to be a substitute for tort liability and allowed recovery of benefits only in the state in which the injury occurred. See In re American Mut. Liability Ins. Co., 215 Mass. 480, 102 N.E. 693, 695-96 (1913); Continental Oil Co. v. Pitts, 158 Okla. 200, 13 P.2d 180, 182 (1932). A leading authority on conflict of laws has criticized this rule as follows: "This rule was overly simple, and excluded from consideration the laws of too many states in which, though injury occurred elsewhere, the relationship out of which it arose had sufficient connection with the forum state to justify application of its law." Robert A. Leflar, Luther F. McDougal III, and Robert L. Felix, American Conflicts Law § 160, at 450 (4th ed. 1986). Other cases adopted a straight contract theory. Under such an approach, the compensation act of the state where the contract of employment was made was held to govern, regardless of where the injury occurred. Id. § 160, at 451 (citing Kennerson v. Thomas Towboat Co., 89 Conn. 367, 4 A. 372 (1915); Pierce v. Bekins Van & Storage Co., 185 Iowa 1346, 172 N.W. 191 (1919); Hartigan v. Babcock & Wilcox Co., 191 Kan. 331, 380 P.2d 383 (1963); Houle v. Sleams-Rogers Mfg. Co., 279 Minn. 345, 157 N.W.2d 362 (1968)).

Both the tort and contract approaches proved unsatisfactory in practice. The theory most frequently followed today allows the parties to agree that the situs of the employment relationship is the state in which that relationship is principally localized or the employer's business is localized. Id. § 160, at 452 (citing Hale v. Texas Employers' Ins. Ass'n, 150 Tex. 215, 239 S.W.2d 608 (1951); Simonton v. Department of Indus., Labor & Human Relations, 62 Wis.2d 112, 214 N.W.2d 302 (1974); Hagberg v. Colonial & Pac. Frigidways, Ins., 279 Minn. 396, 157 N.W.2d 33 (1968)). The rationale underlying this principle is sound. As stated in American Conflicts Law, supra, § 160, at 454: "It is understandable that at the inception of their contract the

8

parties, particularly the employer, may wish to fix the governing law conclusively so that they can know what their rights or duties are, and so that compensation liability insurance can be taken out under the controlling state's system."

Under the current weight of authority, therefore, what Deaton did here was permissible and proper. Alabama law specifically authorizes such an arrangement; it remains to consider whether North Carolina law prohibits it.

B.

North Carolina General Statute § 97-93 requires every employer subject to the North Carolina Workers Compensation Act to insure its entire liability under the Act or qualify as a self-insurer. From this TIG reasons that since Deaton was not a qualified self-insurer in North Carolina and the Travelers policy was its only policy covering North Carolina risks, the Travelers policy must, under the statute, cover all such risks.

The public policy of North Carolina embodied in section 97-93 is to insure that anyone injured on the job will receive compensation. A contract will be deemed unenforceable because of public policy where the "public interest is injuriously affected in such a substantial manner that private rights and interests should yield . . . ." Goodwin v. George Fischer Foundry Sys., Inc., 769 F.2d 708, 713 (11th Cir. 1985). The rule that "contracts contravening public policy are unenforceable should be applied cautiously and only in cases plainly within the reason for it." Id. The state in which an injured employee resides certainly has an interest in his compensation, since that state would likely have to support him if he did not receive benefits. See Cardillo v. Liberty Mutual Ins. Co., 330 U.S. 469 (1947) (sustaining an award of compensation in the District of Columbia where the claimant lived, even though he was continuously employed and injured in Virginia). This interest is satisfied, however, when the injured worker receives adequate benefits under the law of any state, whether or not the state paying benefits is the state where he lives.

North Carolina public policy is, therefore, not violated if Coffman, injured in North Carolina, receives benefits under the Alabama com-

9

pensation system. The parties all agree that Coffman is entitled to benefits. So long as Deaton maintains insurance to pay such benefits, the public policy of North Carolina is satisfied. The express language of the North Carolina statute does not dictate a different result; it merely requires that an employer self-insure or "insure and keep insured his liability under this Article in any authorized corporation, association, organization or in any mutual insurance association . . . ." N.C. Gen. Stat. § 97-93(a)(1).

We therefore conclude that to give effect to the intentions of the parties in this case will do no violence to the law or public policy of either state.[2] What Deaton did to insure its workers compensation risk is specifically sanctioned by Alabama statutes. The intent of North Carolina is likewise protected. The public policy of the latter state, expressed in its statute, is simply to insure that workers injured in job-related accidents in North Carolina receive benefits; this policy is served regardless of which insurance company pays. [3] Accordingly, the decision of the district court is

AFFIRMED.

_____

[2] The record does not reflect whether Coffman's North Carolina claim was fully processed. Had his claim been processed to completion under North Carolina law and North Carolina opted to prefer its own law over Alabama's, a different result might be indicated. Supreme Court cases give the state of injury the option to apply its own law or to adopt the law of a sister state "insofar as remedies for acts occurring within her boundaries are concerned." Carroll v. Lanza , 349 U.S. 408, 414 (1955). Here, there is no indication that North Carolina has made such an election; in the absence of such an election, we are free to give effect to the intentions of the parties as expressed in their contracts. The Supreme Court cases are discussed at Eugene F. Scales and Peter Hay, Conflict of Laws §§ 17.45 and 17.46 (2d ed. 1992).
[3] The court does not have before it a comparison of the levels of benefits payable under the laws of the two states. We do not believe, however, that a disparity in the level of benefits would lead us to a different result. Ordinarily, differences in the laws of two states should not lead to the conclusion that application of the law of one of them violates the public policy of the other. Eugene F. Scales and Peter Hay, Conflict of Laws § 17.46, at 648 n.4 (2d ed. 1992).